# NEWPORT COUNTY.

———

JULIA WARD HOWE *vs.* GEORGE H. NORMAN *et al.*

A. filed a bill in equity against B. to enjoin him from detaining and ponding a stream of water which rose on B.'s land, and flowed in a natural channel to and through the land of A.

*Held*, that B. could not justify the detention and diversion by showing that he intercepted the water at its source on his land.

*Held*, further, that B. could not justify by showing that the water was ponded to prepare a reservoir which might be needed to supply a town with water under a contract made with the town by him.

*Held*, further, that B. could not justify under Pub. Laws R. I. cap. 863, of April 21, 1881, as this act gives no power to take and condemn land, water, or water rights.

BILL IN EQUITY, for an injunction.

The bill of complaint in this case was filed December 9, 1880. The answer made under oath by Norman, the principal respond-ent, sets forth that he "admits that said complainant has a small artificial pond on her premises, and that there is a stream of water which has its rise in certain springs arising on neighboring lands of this respondent, and forming thereon a large pond, which stream of water flows through the lands of the complainant, and from which her artificial pond is by artificial means supplied with

water; and with the reasonable supply of water for this pond or for the supply of water for the domestic uses of the complainant, or for the use of her cattle, he does not in any way interfere or abridge, and with such reasonable use of said water by said complainant he has no intention to interfere or abridge at any time hereafter; yet, as he alleges and sets up, he owns the water arising from the springs on his own land, and he has the right to cut off any stream which runs from his land by erecting a dam across the place where the water takes the form of a stream upon his said lands, and to appropriate the said water to any lawful or proper use to which he may desire to appropriate the same. That he has erected a dam across the head of the said stream, and has inserted a pipe therein open so as to regulate the flow of water from his said land, and holding and graduating the flow of water from his said land, so that his land back and to the south and southeast of the said dam may be flooded so that vegetation growing thereon will be killed and die out, and the water thereof will be purified therefrom, with the ultimate purpose, should the exigencies of the city of Newport require a larger supply of water, that the water above his dam might be availed of to supply the said city, under a contract with which he is bound to supply it with pure water. He further avers that it is quite uncertain whether the present source of supplying the said city is not and will not be fully adequate for all of its requirements for many years to come. But he has purchased the lands and erected the dam described in the complainant's bill, only as a matter of great caution to provide for any rapid increase and growth in the population of Newport, and the consequent increase in the demand of the city for water under his contract with the said city. That he has not violated any of the rights of the complainant, and does not intend to violate any of the rights of the complainant, by means of anything he has done upon his said estate, or by anything he intends to do there, and this he is ready to aver, maintain, and prove as this honorable court shall direct; wherefore he prays that the complainant's bill of complaint may be hence dismissed, and he may be allowed his costs."

*Providence, January* 10, 1882. DURFEE, C. J. This is a suit in equity for an injunction to restrain the defendants from inter-

cepting, by means of a dam, built on the land of the defendant Norman, the water of a stream which rises on said land and flows thence to the land of the complainant, where it is ponded for domestic uses. Three defences are set up to the suit.

The first defence is that the defendant Norman has a right to intercept and appropriate the water because it comes to the surface on his own land, rising there in springs and forming a pond. It is admitted, however, or at any rate it has been made to appear to the court, that the water, though rising on Norman's land, flows away from it over the land of the complainant, into her door-yard, in a natural and definite course or channel. To allow Norman, therefore, to intercept and appropriate it would be to allow him to deprive the complainant of a natural and immemorial privilege or easement appurtenant to her estate, and which is as much a part of her estate as the ground to which it appertains. At common law, of course, he has no right to do this. See especially, among cases cited for the complainant, *Dudden* v. *Guardians of Clutton Union*, 1 H. & N. 627 ; *Arnold* v. *Foot*, 12 Wend. 330. In the first of these cases water, which flowed from a spring in a natural channel, was cut off at its source. The court decided, in favor of a lower owner, that this was not permissible. Said Martin, B.: " A river begins at its source where it comes to the surface, and the owner of the land on which it rises cannot monopolize all the water at the source so as to prevent its reaching the land of other proprietors lower down." And Watson, B., said : " The stoppage at the spring head is just as much a diversion as if the water had been taken lower down." In *Broadbent* v. *Ramsbottom*, 11 Exch. 602 ; 34 Eng. Law & Eq. 553, which is cited for the defendant, the water which was intercepted soaked through the ground and did not run in a natural channel. In *Gibbs* v. *Williams*, 25 Kans. 214, also cited for the defendant, the water was surface water taken before it took the form of a watercourse. In our opinion, therefore, the first defence is not tenable.

The second defence is this: The defendant Norman has a contract with the city of Newport to supply the city with pure water, and in execution of this contract has constructed a costly system of water works. His purpose in erecting the dam is to create an

additional source of water supply; but he represents that it is uncertain whether he will have need of it for many years, the supply which he has being sufficient for the present wants of the city. If this were the whole case, the suit might perhaps be regarded as premature. It is not the whole case. The defendant admits, that while he has no present need of the water for the city, yet it is his present purpose to intercept it in order to flood the land behind his dam, so that vegetation growing thereon will be killed and die out and the water be purified for future use in supplying the city. But if he has no right ultimately to intercept and appropriate the water permanently for the use of the city, neither has he any right to intercept and accumulate it, even temporarily, with a view to such ultimate permanent appropriation. The ultimate appropriation being unlawful, a present retention intercepting the customary flow, with a view simply to such ultimate appropriation, is equally unlawful and should be enjoined.

The third defence is that the defendant has a right to take the water for the proposed uses under Pub. Laws R. I. cap. 863, of April 21, 1881.[1] Chapter 863 enacts that "the provisions of chapter 92 of the General Statutes are hereby extended to and are made to include lands, water privileges, and water rights, taken to supply or to enlarge the supply of any town, city, or village with water, and the remedies provided in said chapter for any person whose land may be taken, or rights of property, corporeal or incorporeal, may in any way be affected, are hereby given against the party or corporation taking such property or affecting such right to the full extent, as if the same had been taken for mill purposes under the provisions of the said chapter 92 of the General Statutes." The complainant contends that the chapter does not give the power to take, but only provides a remedy in case the power has been otherwise conferred and acted upon. The power is not expressly granted, and the general rule is that such a power, being in derogation of common right, is not to be implied. Cooley's Constit. Limit. *560. But notwithstanding this rule, we were at first inclined to think that here, in order

---

[1] Given in full in the concurring opinion of POTTER, J., below.

to make the statute effectual without further legislation, the power might be implied; but the strong reasons against that view which are set forth in the opinion drawn up by Judge Potter on this point have brought us to a contrary conclusion.

Let a decree be entered perpetually enjoining the defendants from preventing, or in any way materially diminishing, the customary flow of the stream, with costs for the complainant.

POTTER, J., concurring. It is pretty difficult to say what the General Assembly intended by the passage of the act, Pub. Laws R. I. cap. 863, of April 21, 1881. The act is as follows:

· "AN ACT IN ADDITION TO CHAPTER 92 OF THE GENERAL STATUTES 'OF WATER MILLS.'"

"*It is enacted by the General Assembly as follows:*

"SECT. 1. The provisions of chapter 92 of the General Statutes are hereby extended to, and are made to embrace lands, water privileges, and water rights, taken to supply or to enlarge the supply of any town, city, or village with water; and the remedies provided in said chapter for any person whose land may be taken, or rights of property, corporeal or incorporeal, may in any way be affected, are hereby given against the party or corporation taking such property or affecting such right to the full extent, as if the same had been taken for mill purposes under the provisions of the said chapter 92 of the General Statutes.

"SECT. 2. No property condemned under the provisions of this act shall be exempted by any town council from taxation."

By § 1, the provisions of Gen. Stat. R. I. cap. 92, commonly known as the Flowage Law, or Mill Act, are extended to lands and rights "taken" to supply or enlarge the supply of water for any city or village. Now let us give "taken" its strongest meaning, and substitute in its place the word "condemned" used in § 2; and what does it mean? Condemned indeed, but by whom or by what authority? This act gives no authority to any person or corporation to condemn. The act which it amends gave no authority to any one to take land but only to flow it; and to have this power, the taker must own a mill dam.

Did it intend to give to any city or village the right to take lands whenever and wherever they choose, in order to obtain

water for city or village use ?   As these things involve large expenditure and heavy debt and taxation, the legislature has never yet allowed any city to do this without an act expressly granting the power, and without submitting the question to the people who were to be taxed.   There is nothing in this act which leads us to suppose that the General Assembly intended to depart from the heretofore settled policy of the State ; and if they had so intended, they would not have used ambiguous language to do it.

Did they intend to authorize any individual to take land without any express grant of power ?   It is not reasonable to suppose they intended to give to any man the power to condemn in advance another man's land, merely because it might be possible that some city might afterwards want it for public use for water purposes.

It is one of the oldest and most fundamental principles of law that the legislature cannot give to A. the power to take B.'s land, or any right or easement in it, for private use ; and the fact that by the promotion of health or agriculture the public might derive an incidental benefit can make no difference, and, in the case just supposed, the present use would be altogether private.

Could it be intended by this act to give this great power to a person who had contracted to supply a city ?   If the legislature cannot reasonably be supposed to have intended to give it to the city itself, the reason seems still stronger in the case of a mere contractor.

When an application is made to the General Assembly to grant this power to a city, it has generally been made a matter of public discussion before granting it.   By Gen. Stat. R. I. cap. 18, § 1, which is not a new law, but of ancient date, in all cases affecting "the right or interest of any other person than the petitioner," the legislature has itself laid down the rule of right and requires that notice shall be given ; and the legislature has by the Constitution no power to create a corporation which is to have this power of taking private property, without public notice.   The fact that these provisions are not always strictly complied with does not affect the question.   They recognize the principle that in such cases notice should be given.   They acknowledge a rule of right and justice, and when a proposition is before the General As-

sembly in plain and intelligible language, to grant this enormous power of taking one man's property at the will of another, it is at least likely that it will be discussed, and that all parties interested will know of it and have a chance to be heard.

But supposing that in the present case the legislature had given public notice in the newspapers to all parties interested to appear if they saw fit, and be heard in opposition to the passage of " An act in addition to chapter 92 of the General Statutes ' of Water Mills ; ' " who would even have supposed that it contained a provision authorizing cities, villages, and individuals to take private property for supplying cities and villages with water ?

Again, if such power is given at all by this act, it is given to villages as well as to cities. Did the legislature mean that the owners or majority of owners of any half-dozen houses standing in proximity and commonly known as a village, may not only tax each other, but take other persons' property at their pleasure, to make a pond or dig a trench to bring water to it ? We have indeed some villages authorized to tax within certain limits for protection against fire ; but their powers are limited.

But if this act does intend to give the right of eminent domain to anybody and everybody, it is open to another objection. It is the better opinion that the legislature cannot grant the power to take property for public uses, without providing. that compensation shall be made, and except in the case of municipal corporations, without also providing for securing the payment of this compensation. This act makes no such provision. It gives only the remedy which a man has whose land is flooded by a mill-dam, and that is a lien upon the mill and mill-dam. It does not appear that Mr. Norman owns any mill or mill-dam. If it had been intended to give a lien upon his water works, it would have been easy to say so.

And the powers of cities and towns in this State as to taxation and incurring debts are limited. Ordinarily they would not be justified in incurring a debt for any purpose for which they could not levy a tax. The legislature has always provided for incurring water debts by special acts for that specified purpose. Can we suppose that the legislature intended by the present act to abolish all these salutary restrictions ?

But it is contended by the defendant's counsel that the act was intended to cover such a case as the present, and that he is entitled to the benefit of it. By an act passed February 8, 1877, Pub. Laws R. I. cap. 582, George H. Norman was invested with the power to condemn certain lands and water rights to supply the city of Newport with water. By Pub. Laws R. I. cap. 634, passed May 31, 1877, this act was amended so as to authorize the taking of more land and water, but not in any way to affect the question before us.

But it is a sufficient answer to this that Norman's power to condemn was limited to three years from February 8, 1877, and the present pretended condemnation was not made until after the three years had expired, and there was no power of condemnation in existence at the time.                      *Decree accordingly.*

*Arnold Green & Samuel R. Honey*, for complainants.

*William P. Sheffield & Francis B. Peckham, Jun.* for respondents.